IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LAWRENCE BLITZ, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 3:11-cv-00992 |
| | ) | Judge Campbell / Knowles |
| AGFEED INDUSTRIES, INC., JOHN A. STADLER, GERARD DAIGNAULT, CLAY MARSHALL, EDWARD PAZDRO, SONGYAN LI, SELINA JIN, LIANGFAN YAN, JUNHONG XIONG, GOLDMAN KURLAND & MODHIDIN, LLP, and McGLADREY & PULLEN, LLP, | ) ) ) ) ) ) ) ) ) | Consolidated Class Action |
| Defendants. | ) | |

# REPORT AND RECOMMENDATION

This matter is before the Court upon a Motion to Dismiss the Second Consolidated Amended Class Action Complaint filed by Goldman Kurland & Modhidin, LLP's (hereinafter "Goldman" or "Defendant"). Docket No. 186. Defendant has contemporaneously filed a supporting Memorandum of Law. Docket No. 187. Defendant also incorporates by reference the May 28, 2013 Declaration with Exhibits of its counsel, Mr. John L. Farringer.[1] *See* Docket No. 186, *referencing* Docket No. 140 (filed in connection with the Motion to Dismiss the First Amended Complaint).

As grounds for its Motion, Defendant contends that: (1) Plaintiffs' securities fraud claims

---

[1] Because the instant Motion is a Motion to Dismiss, the undersigned will decline to consider matters outside of the pleadings.

against it as an outside auditor fail to "satisfy especially stringent standards for pleading scienter"; (2) Plaintiffs' fail to plead particularized facts creating a strong inference of scienter; (3) Plaintiffs' allegations show that AgFeed deliberately concealed its purported fraud from Defendant; (4) Plaintiffs' allegations regarding purported red flags do not create a strong inference of scienter; and (5) Plaintiffs' allegations regarding Defendant's purported lack of independence do not raise a strong inference that Defendant acted with scienter. Docket No. 187, *passim*. Defendant seeks dismissal of Plaintiffs' claims against it. *Id.*

Plaintiffs have filed a Response, arguing that: (1) they have indeed pled facts giving rise to a strong inference that Defendant acted with scienter; (2) Defendant's lack of independence raises a strong inference of scienter and violates Generally Accepted Auditing Standards ("GAAS"); and (3) Plaintiffs' allegations regarding red flags create a strong inference of scienter. Docket No. 197. Plaintiffs argue that Defendant "'refused to see' obvious fraud or investigate numerous red flags, instead conducting an audit so shoddy it was tantamount to no audit at all." *Id.*, p. 8. Plaintiffs assert that federal auditing standards forbid auditors from "turning a blind eye" to management fraud, and that fraudulent intent can be attributed to an auditor who meets certain criteria (which Plaintiffs contend Defendant does, when the facts of this case are "viewed holistically"). *Id.*, p. 7. Accordingly, Plaintiffs seek to hold Defendant accountable. *Id., passim.*

Defendant has filed a Reply, arguing, *inter alia*:

> At the outset, Plaintiffs site the wrong legal standard for scienter. While Plaintiffs would have this Court apply the general standard for recklessness, the Sixth Circuit has repeatedly held that "[t]he standard of recklessness is more stringent when the defendant is an outside auditor" and requires a mental state "so culpable that it approximate[s] an actual intent to aid in the fraud

2

> being perpetrated by the audited company. This distinction is critical here, as Plaintiffs have failed to identify any specific information in [Defendant's] possession at the time of its audits that would indicate that [Defendant] "must have been aware" of AgFeed's purported fraud. To the contrary, an internal AgFeed e-mail referenced in the Second Amended Complaint provides direct proof that [Defendant] was neither aware of, nor complicit in, AgFeed's purported accounting scheme, and that AgFeed executives actively conspired to conceal its scheme from [Defendant].
>
> In the absence of any specific facts establishing [Defendant's] complicity - and, in the face of specific evidence establishing [Defendant's] actual innocence - Plaintiffs again misstate the law in advancing two central arguments in support of a finding of scienter: (1) [Defendant's] scienter may be inferred based on the magnitude and pervasiveness of AgFeed's accounting errors; and (2) scienter may be inferred because Goldman had a financial motive to engage in fraud. The Sixth Circuit, however, has explicitly rejected both of these arguments. Beyond these discredited arguments, all that remains of Plaintiffs' Opposition is the repeated reference to the same purported "red flags" cited in their Second Amended Complaint, the legal and factual insufficiency of which Plaintiffs fail to adequately address.

Docket No. 199, pp. 1-2 (footnote omitted).

This is a securities fraud class action, filed on behalf of all persons who purchased or otherwise acquired the securities of AgFeed during the period from March 16, 2009 through and including September 29, 2011 (the "Class Period"), against AgFeed, certain of its officers and directors, and AgFeed's accountants, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. Goldman was an outside auditor. On August 14, 2014, the parties submitted a Joint Report on Settlement, indicating that Plaintiffs have reached a settlement with all Defendants other than Goldman. *See* Docket No. 213.

3

For the reasons discussed below, the undersigned recommends that the instant Motion to Dismiss (Docket No. 186), be GRANTED, and that Plaintiff's claims against Goldman be DISMISSED WITH PREJUDICE.

## II. Allegations Pertaining to Goldman Contained in Plaintiffs' Second Consolidated Amended Class Action Complaint

Goldman is an accounting firm that provided accounting services to AgFeed from at least 2007 to November 2010. Docket No. 170-2, ¶ 37. Goldman also provided accounting services to at least three other companies associated with Chinese stock promoter Tianbing "Benjamin" Wey, whose New York Global Group was closely affiliated with AgFeed during the Class Period. *Id.* Goldman was responsible for auditing AgFeed's books and records, and falsely certified that its 2008 and 2009 annual financial statements filed with the SEC conformed with GAAP. *Id.*

The friendly auditor Wey used to legitimate AgFeed and other Chinese reverse merges was an accountant named Ahmed Mohidin ("Mohidin"), formerly a partner in Kabani & Co. and more recently a named partner at Goldman. *Id.*, ¶ 42.

In its Encino, California office, Goldman employs three partners and sixteen accountants, eight of whom are certified public accountants. *Id.*, ¶ 51. According to its report to the Public Company Accounting Oversight Board ("PCAOB") for fiscal year 2011, Goldman audits twenty-two public companies, and derives 80% of its revenues from these audits. *Id.*, ¶ 52. Fifteen of the twenty-two companies Goldman audits either have their main office in China, or conduct the majority of their operations there. *Id.*, ¶ 53. Despite this, Goldman has no office in China. *Id.* Instead, to conduct audit work in China, Goldman retains one of two audit firms: Beijing Ever Trust CPAs Co., Ltd. ("BETL") or Beijing AnShun International CPAs Co., Ltd.

4

("AnShun"). *Id.* AnShun receives approximately 90% of its revenues from aiding Goldman in auditing U.S.-listed companies; BETL receives 83% of its revenues from aiding Goldman in auditing U.S.-listed companies. *Id.*, ¶ 54. Between them, BETL and AnShun aided Goldman in twelve audits in for the year ending December 31, 2010. *Id.*, ¶ 55. Other than aiding Goldman's audits, BETL and Anshun performed no work for U.S.-based reporting companies. *Id.* Despite its limited involvement with any of these audit clients, Goldman nevertheless signed audit reports for all twelve firms. *Id.*, ¶ 56. Goldman's involvement is limited to drafting a planning memo and training Anshun or BETL personnel. *Id.* In other words, Goldman outsources to Anshun and BETL the due diligence aspects of its audit. *Id.* According to one of Goldman's audit clients, "Anshun's international audit department works exclusively for [Goldman] and is, in substance, their office in China." *Id.*

Wey invariably recommends that clients use Mohidin or Goldman. *Id.*, ¶ 57. Because of their relationships with Wey, Goldman and Mohidin are insulated from the reputational effects felt by other auditors who perform shoddy audit work. *Id.*, ¶ 58. Goldman and Mohidin will continue to have lucrative relationships with Chinese reverse merger companies so long as they satisfy Wey. *Id.* Thus, where other auditors seek to cultivate a reputation for probity and independence, Goldman and Mohidin seek to cultivate Wey's good opinion of them and their usefulness to Wey's purposes. *Id.*

The 2008 10-K of AgFeed also contained, by express consent, the audit report of Goldman. *Id.*, ¶ 88. Goldman's audit report falsely characterized Goldman as an "independent" auditing firm, assured investors that Goldman conducted a reasonable audit, and concluded that:

> the financial statements referred to above present fairly, in all
> material respects, the financial position of AgFeed Industries, Inc.

5

> as of December 31, 2008, and 2007, and the results of its
> operations and its cash flows for the years ended December 31,
> 2008 , 2007 and 2006, in conformity with accounting principles
> generally accepted in the United States of America. Also in our
> opinion, AgFeed Industries, Inc. maintained, in all material
> respects, effective internal control over financial reporting as of
> December 31, 2008, based on criteria established in Internal
> Control-Integrated Framework issued by the Committee of
> Sponsoring Organizations of the Treadway Commission (COSO).

*Id.*

The statements Defendant made in the 2008 10-K as specified above were materially false and misleading because, *inter alia,* Goldman was not an independent auditing firm, but rather, was instead beholden to Benjamin Wey, the same shady stock promoter who pumped AgFeed to public investors; and Goldman had not conducted a reasonable audit of the Chinese operations and thus was unable to meaningfully determine whether the Company's stated asset values, inventories, allowances, and receivables were accurately reflected on the Company's financial statements. *Id.*, ¶ 89.

The 2009 10-K of AgFeed also contained, by express consent, the audit report of Goldman. *Id.*, ¶ 108. Goldman's audit report falsely characterized Goldman as an "independent" auditing firm, assured investors that Goldman conducted a reasonable audit, and concluded that:

> the consolidated financial statements referred to above present
> fairly, in all material respects, the consolidated financial position
> of AgFeed Industries, Inc. and subsidiaries as of December 31,
> 2009, and 2008, and the consolidated results of their operations
> and their cash flows for the years ended December 31, 2009, 2008
> and 2007, in conformity with accounting principles generally
> accepted in the United States of America. In our opinion, the
> related financial statement schedule, when considered in relation to
> the basic financial statements taken as a whole, presents fairly, in
> all material respects, the information set forth therein. Also in our

> opinion, the Company maintained, in all material respects,
> effective internal control over financial reporting as of December
> 31, 2009, based on criteria established in Internal Control-
> Integrated Framework issued by the Committee of Sponsoring
> Organizations of the Treadway Commission (COSO).

The statements Defendant made in the 2009 10-K as specified above were materially false and misleading because, *inter alia*, Goldman was not an independent auditing firm but was instead beholden to Benjamin Wey, the same shady stock promoter that pumped AgFeed to public investors; and Goldman had not conducted a reasonable audit of the Chinese operations and thus was unable to meaningfully determine whether the Company's stated asset values, inventories, allowances, and receivables were accurately reflected on the Company's financial statements. *Id.*, ¶ 109.

Both Goldman and McGladrey (another Defendant in this action) misrepresented in the audit reports they caused to be included in the 2008 and 2009 10-Ks (Goldman) and the 2010 10-K (McGladrey and Goldman) that they conducted their respective audits pursuant to Generally Accepted Auditing Standards ("GAAS"), and that a proper audit concluded that, without qualification, the financial statements contained in the respective 10-Ks complied with U.S. GAAP. *Id.*, ¶ 156. In fact, none of their audits was conducted consistent with GAAP, and the only reason they were able to provide AgFeed with unqualified audit opinions was their own recklessness in the conduct of the audits and refusal to investigate red flags. *Id.* GAAS are the standards prescribed by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA") for the conduct of auditors in the performance of an examination of management's financial statements. *Id.*, ¶ 157.

Goldman's 2007 and 2008 audit letters each describe Goldman as an "independent"

accounting firm. *Id.*, ¶ 158. These representations were false and misleading because Goldman did not maintain the independence required under GAAS. *Id.* The Second General Standard under GAAS requires that auditors "maintain independence in mental attitude in all matters relating to the audit." *Id.* According to the AICPA's interpretive Statement of Accounting Standards 1, § 220:

> This standard requires that the auditor be independent; aside from being in public practice (as distinct from being in private practice), he must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be.

*Id.*

Goldman violated GAAS's independence standard and misrepresented both its own independence and the propriety of its audits because Goldman did not maintain independence. *Id.*, ¶ 159. Far from being independent, Goldman was deeply beholden to AgFeed's stock promoter, Wey, and through this obligation, to AgFeed's management. *Id.* AgFeed's auditing engagement was secured and overseen by Ahmed Mohidin ("Mohidin"), who himself was deeply beholden to Wey and profited substantially from his decade-long relationship with Wey. *Id.* As detailed by a leading investigative reporter, Wey consistently caused the shoddy Chinese reverse mergers he brought public to engage Mohidin's firm (originally Kabani and more recently Goldman) as its "independent" auditor. *Id.* This created a steady and profitable revenue stream for Mohidin and his firms, including Goldman. *Id.*

Wey and Goldman's partner, Mohidin, had a reciprocal relationship. *Id.*, ¶ 160. Using his control of management and the audit committee of the board of directors, Wey ensured that his client companies would steer audit business to Mohidin. *Id.* Mohidin, in turn, provided soft

8

audits that allowed the companies to hide financial irregularities and/or deficiencies internal controls. *Id.* In addition to its own ties with Wey, Goldman retained third-party Chinese accounting firms BETL and Anshun that were also under Wey's influence to perform critical field work. *Id.*, ¶ 161. BETL and AnShun, were consistently provided field work on audits of Wey-promoted companies and, on information and belief, such field work was the primary source of their revenues. *Id.*

By virtue of its own ties to Wey, its outsourcing of field work to a Chinese firm tied to Wey, and its relationship with audit committee chair Staloff who was installed by Wey, Goldman was unable to provide the independence required under GAAS. *Id.*, ¶ 162. Goldman recklessly omitted these ties from investors in misrepresenting itself as independent. *Id.*

Each of Goldman's audit reports in the Class Period misrepresented that Goldman had "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)," which it acknowledged required Goldman to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects." *Id.*, ¶ 163. In fact, Goldman failed to plan and perform the audit in conformance with required standards. *Id.*

Goldman outsourced virtually all of the field work to a third-party entity, BETL and/or Anshun, and lacked reasonable assurance that BETL and/or Anshun had adequately determined the fair value of assets, including property, equipment, and inventory in the hog business and accounts receivable and a corresponding allowance for doubtful accounts in the animal feed business. *Id.*, ¶ 164. Indeed, in a review of a Goldman audit of AgFeed by the PCAOB

9

investigators found that the audit "included deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements." *Id., citing* PCAOB Release No. 104-2011-224.

Goldman recklessly disregarded numerous red flags indicating a likelihood that AgFeed's financial statements were not "free of misstatement" and that AgFeed did not maintain "effective control over financial reporting." *Id.*, ¶ 165. GAAS provides that an auditor's "professional care requires the auditor to exercise professional skepticism," including having "a questioning mind and a critical assessment of audit evidence." *Id., citing* Statement of Auditing Standards No. 99. To exercise this duty, an auditor must consider known external and internal factors that create incentives for misrepresentation or provide the opportunity for fraud to be perpetrated. *Id.* Moreover, an auditor is not free to disregard red flags, but instead must "acquire additional evidence as necessary … rather than rationalize or dismiss" suspicious information. *Id.* Had Goldman exercised the required skepticism, as AgFeed executive Jiangqi "Kitty" Wu admitted, it
would have "easily" discovered the fraud. *Id., referencing id.,* ¶ 95.

Despite these obligations, Goldman repeatedly and recklessly disregarded red flags that alerted it to the possibility of fraud and the need for a more thorough audit. *Id.*, ¶ 166. By the time that Goldman had issued its audit reports in March 2009 and 2010, Goldman was well aware that Wey's reverse-merger stock promotions were riddled with fraud, and that Wey himself had been charged with improprieties by the State of Oklahoma and by investors in another Wey firm that Goldman audited, Bodisen Biotech. *Id.* Goldman also knew that prior to its fiscal year 2008 and 2009 audits, AgFeed did have deficiencies in its internal and financial

reporting controls, and further knew that the Chinese hog operations AgFeed acquired in 2007 and 2008 had not previously been audited consistent with U.S. GAAP standards, thus requiring particular attention. *Id.* Goldman's failure to follow up on these red flags grossly violated GAAS, and its statement that it complied with applicable accounting standards was reckless. *Id.*

In its audit reports, Goldman also misrepresented that AgFeed's financial statements "present fairly, in all material respects, the financial position of AgFeed Industries, Inc." at the end of each reporting period "in conformity with accounting principles generally accepted in the United States of America." *Id.*, ¶ 167. This statement was false and misleading because AgFeed's financial statements did not comply with GAAP, and Goldman had actual knowledge that it lacked a reasonable basis to proffer this view under applicable GAAS standards. *Id.*

During the Class Period, Defendant knowingly or recklessly misrepresented material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. *Id.*, ¶ 185. In particular, Defendant misrepresented, *inter alia*, its independence, and the thoroughness of its audits. *Id.*

Defendant misrepresented to investors: (a) the thoroughness of the audits, which were in fact reckless and ignored numerous red flags; (b) AgFeed's compliance with GAAP, helping to mask from investors that the Company had systematically misrepresented its financial condition throughout the Class Period; and (c) its own status as an "independent" auditor. *Id.*, ¶ 189.

### III. Analysis

#### A. Scienter

The Private Securities Litigation Reform Act ("PSLRA") states in relevant part as follows:

11

> (b) Requirements for securities fraud actions.
>
> . . .
>
> (2) Required state of mind. (A) In general. Except as provided in subparagraph (B), in any private action arising under this title [15 U.S.C. § 78a et seq.] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*.

15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).

This standard requires courts to take into account "plausible opposing inferences." *Matrixx Initiatives, Inc. v. Siracusano*, –US–, 131 S.Ct. 1309, 1323 (U.S. 2011)*, quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323, 127 S.Ct. 2499 (U.S. 2007). A complaint adequately pleads scienter under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id., quoting id.* at 324. In making this determination, the court must review "all the allegations holistically." *Id., quoting id.* at 326.

In order to "establish liability . . . a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Matrixx*, 131 S.Ct. at 1323, *quoting Tellabs, Inc.,* 551 U.S. at 319, *quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193-94, and n. 12, 96 S.Ct. 1375 (1976). As the Sixth Circuit has stated, "In the securities fraud context, we have long premised liability on at least 'reckless' behavior." *Louisiana School Employees' Retirement System v. Ernst & Young, LLP,* 622 F.3d 471, 478 (6th Cir. 2010) ("LSERS"). In describing the recklessness standard, the *LSERS* Court stated:

> The standard of recklessness is more stringent when the defendant is an outside auditor. In that instance, recklessness requires a mental state "so culpable that it approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company."
>
> . . .
>
> > Scienter requires more than a misapplication of accounting principles. The [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments that were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.
> >
> > . . .
>
> "To allege that an independent accountant or auditor acted with scienter, the *complaint must identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly*."
>
> The well-pleaded facts must give rise not merely to an inference of scienter, but to a *strong inference* of scienter.

*Id.* at 479 (citations omitted, emphasis added).

In order to establish a strong inference of scienter, Plaintiffs must do more than merely demonstrate that Defendant should or could have done more. *Public Emps. Ret. Assoc. of Colo. v. Deloitte & Touche, LLP*, 551 F.3d 305, 314 (6th Cir. 2009). Additionally, allegations that an accountant failed to closely review files or follow GAAS cannot raise a strong inference of scienter. *LSERS*, 622 F.3d at 482.

## B. The Case at Bar

Plaintiff's averments against Defendant are essentially that Defendant inappropriately

13

outsourced work to BETL/Anshun, failed to properly control the outsourced work and conduct a thorough audit, and ignored "red flags." *See* Docket No. 170-2, *passim*. Plaintiffs' also aver that, because of its outsourcing and ties to certain people, Defendant was not an independent auditor. *Id.* As can be seen in Plaintiffs' allegations against Defendant, set forth in Section II above, Plaintiff's allegations are primarily general, conclusory, and full of assumptions. They do not "identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly."

Reviewing the allegations "holistically" and considering "plausible opposing inferences," the undersigned simply cannot "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." In fact, the complete allegations set forth in Plaintiffs' Second Consolidated Amended Class Action Complaint demonstrate that AgFeed went to great lengths to hide their fraud and prevent its detection, and were, in fact, concerned with being detected by Defendant, who was becoming "more concerned about the accounts receivables." Given AgFeed's deliberate concealment and expressed concern over Defendant's increasing concern about the financials, Plaintiffs' allegations simply do not demonstrate that Defendant acted either with "a mental state embracing intent to deceive, manipulate, or defraud" or a recklessness that was "so culpable that it approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." In fact, Plaintiffs' allegations demonstrate to the contrary.

## IV.  Conclusion

For the reasons discussed above, the undersigned recommends that Defendant's Motion

to Dismiss (Docket No. 186) be GRANTED, and that this action be DISMISSED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____
E. CLIFTON KNOWLES
United States Magistrate Judge